# IN THE UNITED STATES BANKRUPTCYCOURT
# FOR THE DISTRICT OF COLORADO

| | |
|---|---|
| In re: ) | |
| ) | |
| THE SRKO FAMILY LIMITED ) | Case No. 10-13186 SBB |
| PARTNERSHIP ) | Chapter 11 |
| EIN: 20-033442 ) | |
| ) | |
| Debtor. ) | |

## RICHARDSON'S PROPOSED
## FINDINGS OF FACT AND CONCLUSIONS OF LAW

    THIS MATTER comes before the Court on confirmation of the Second Amended Plan of Reorganization Proposed by the Unofficial Mechanics Lienholder Committee (the "Plan") and Jannie Richardson's Objection to Confirmation of Second Amended Plan of Reorganization Proposed by Informal Mechanics Lienholder Committee. A trial on confirmation was conducted on October 16, 2014. The Court, having considered the Plan and the Objection thereto, the testimony at trial, the arguments of counsel and the applicable legal authority, makes the following findings of fact and conclusions of law:

### BACKGROUND

    1.    The Debtor SRKO Family Limited Partnership ("SRKO") was the owner and developer of the project known as Colorado Crossing. The primary mover of that effort was Jannie Richardson.

    2.    Jannie Richardson is a debtor in Case No. 10-16450-SBB before this Court.

    3.    SRKO was owned at the time of filing this chapter 11 case by three trusts originally established by Ms. Richardson. During the case, Ms. Richardson was authorized to act as an agent for these trusts in developing and possibly proposing a plan of reorganization. See Docket no. 573 in case no.10-16450-SBB.

    4.    Randall Lewis was appointed the trustee in Ms. Richardson's individual Chapter 11 case and, pursuant to this Court's order, became the manager of the limited liability company that served as the general partner to SRKO.

    5.    The Informal Lienholder Committee (the "Committee") proposed its Plan containing the following language:

> JANNIE RICHARDSON IS PERMANENTLY ENJOINED FROM, DIRECTLY OR INDIRECTLY, HOLDING HERSELF OUT AS, OR PURPORTING TO ACT AS, AN AUTHORIZED AGENT OF REORGANIZED SRKO, AND FROM

ENTERING ANY PROPERTY OWNED BY REORGANIZED SRKO WITHOUT THE PRIOR WRITTEN CONSENT OF AN AUTHORIZED AGENT OF REORGANIZED SRKO.

6. Ms. Richardson filed timely objection to confirmation of the Lienholder Plan on the basis of the foregoing language.

7. Throughout the two chapter 11 cases, Ms. Richardson worked toward regaining control of Colorado Crossing and either buying the project or proposing a plan of reorganization in either or both cases that would permit the completion of the development. Ultimately, Ms. Richardson proposed her own plan in conjunction with an affiliated entity, WeBelieveInTomorrow, LLC. That plan, offered in competition to the Committee Plan, did not receive enough votes to qualify for confirmation under 11 U.S.C. § 1129(a)(7).

## FINDINGS OF FACT

8. Ms. Richardson was born in Korea and the English language remains a challenge for her.

9. According to the testimony of Mr. Lewis, Ms. Richardson violated the imprimatur against entry onto the Colorado Crossing property without prior permission about a dozen times, often bringing potential investors or lenders with her. Mr. Lewis did not take any action as a result of these incursions, and did not testify as to any damage that occurred to any party as a result of Ms. Richardson's actions.

10. Mr. Lewis testified that, shortly before his appointment as trustee in 2011, Ms. Richardson attempted to switch out the control of the general partner for SRKO, but also admitted that she was at all times represented by counsel.

11. Mr. Lewis testified that Ms. Richardson had conducted certain activities relating to the Metro Districts that encompass Colorado Crossing. These actions apparently consisted primarily of attempting to certify the improvements at Colorado Crossing, which is a necessary step to obtain reimbursement from the Metro Districts. However, he also admitted that at all times, the Metro Districts were represented by counsel, Joan Fritsche. Although he stated that Ms. Richardson resisted resigning from the Metro District board for an extra day or two past the agreed time for her resignation, he also testified that she had desired to consult with an additional attorney specializing in metro districts to verify that she was required to resign. These events were approximately 18 months ago, and Mr. Lewis testified that Ms. Richardson has not taken any further action of any kind relating to the Metro Districts.

12. Mr. Sorenson, a representative of a member of the Committee, testified that he was to be the president of the reorganized debtor. In that role, he testified that he was concerned that Ms. Richardson would misrepresent herself as being in control of SRKO after confirmation of the Plan and that she would trespass on the property with potential investors. He stated that all of this would impair marketing of the project because people would be confused about who was actually in control. He based this opinion on the fact that some parties who had inquired about

2

purchasing or investing in Colorado Crossing during the Chapter 11 case expressed concern that Ms. Richardson might obtain regain control of the project. He also based his surmise that a person walking on the property without permission gave the impression that such person had a right to be there, thus confusing who was really in control. However, he also admitted that this would be true with regard to people other than Ms. Richardson and the Committee was not seeking an injunction against anyone else.

13. Mr. Lewis testified that he had marketed the property, but had received no formal offers. He attributed this to the ability of the mechanics lien holders to "bid in" their liens, the complexity of chapter 11, and the complexity of developing Colorado Crossing.

14. Mr. Sorenson also testified that Colorado Crossing was a troubled project and that its complexity hindered development and discouraged purchasers. He testified that there were some potential construction defects relating to the garage theater which occurred at a time when Ms. Richardson was acting as the general contractor, and that these activities caused extensive additional due diligence requirements and risk adjustments.

15. Mr. Sorenson also based his concern on the fact that Ms. Richardson was "an extraordinary person," "aggressive," and that she was still trying to make an offer to buy the property, and that she was fighting the injunction language.

16. Mr. Sorenson testified that the minimum price for any lot at Colorado Crossing was currently projected at $650,000 and that the buyer was highly likely to spend at least that much or more in developing the lot.

## CONCLUSIONS OF LAW

17. To obtain a permanent injunction, a party must demonstrate: 1) it has suffered an irreparable injury; (2) remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) the public interest would not be disserved by a permanent injunction. *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006). An injunction is considered drastic relief to be provided with caution, therefore granted only in cases where the necessity for it is clearly established. *United States ex rel. Citizen Band Potawatomi Indian Tribe of Okla. v. Enter. Mgmt. Consultants, Inc.*, 883 F.2d 886, 888-89 (10th Cir. 1989)(preliminary injunction); *Wyoming v. USDA*, 661 F.3d 1209 (10th Cir. Wyo.2011)(recognizing same standard for permanent injunctions).

18. The Court's first concern is whether any injury or potential injury has been shown. This analysis has two parts: is there a wrongful act that is occurring or is about to occur absent an injunction, and will that act lead to irreparable injury. It is not enough simply to show that an injury, if it occurred, would be irreparable; there must be evidence that the acts sought to be prohibited are likely to occur unless the injunction enters. See e.g. *Waterton Polymer Prods. USA, Inc. v. Edizone, LLC*, 2014 U.S. Dist. LEXIS 14112 (D. Utah September 30, 2014 (finding that the harm that would occur was "undoubtedly irreparable" but denying injunction because of

3

the lack of evidence that the plaintiff "will suffer such injuries should a permanent injunction fail to issue.")

19. The Committee fails to make either showing. What occurred during the Chapter 11 must be distinguished in large part from what is likely to occur post-confirmation. Thus, for example, the alleged misrepresentations by Ms. Richardson that she had the authority to act for SRKO must be understood in the context of a controlled court process by which she may well have gained control over SRKO. She was, in fact, authorized by this court to act as an agent for the Dynasty trusts in this very regard. Given the fact that Ms. Richardson's command of the English language is less than perfect and the confusion that undoubtedly surrounds a complicated situation such as that presented by this case, the Court cannot accept these few statements Ms. Richardson allegedly made during the case as evidence she is likely to continue to do so once the confirmation order is entered. Entry of the confirmation order states to the world that Ms. Richardson no longer has any ability to gain control of SRKO or of Colorado Crossing unless the reorganized debtor chooses to sell the property. The Committee has presented no evidence that she is likely to make any misrepresentations about control over SRKO in the future. The mere fact that Ms. Richardson is "extraordinary," "aggressive," or even that she has a reputation for never giving up is not evidence that she is likely to commit any wrongful act in being extraordinary, aggressive, or not giving up.

20. Moreover, the Court fails to see what injury actually ever occurred from these alleged statements during the case. Surely, any potential investor dealing with Ms. Richardson had to be a sophisticated party, just given the millions of dollars any such investment entailed. The Court finds it hard to believe that any such party would be confused or misled, even if Ms. Richardson were to make such a statement. But first and foremost, there is no evidence whatsoever that she is likely to make such a statement once the confirmation order has shut the door on the legal process by which she might regain control.

21. The same is true regarding the purported fear of confusion that might result if Ms. Richardson walked on the property without permission in the company of potential investors. The court simply cannot believe that such investors would be so naïve as to be confused. Moreover, Mr. Sorenson testified that the same potential confusion would result when a potential lot buyer walked on the property without permission, yet the Committee does not seek an injunction against these parties.

22. Although Mr. Sorenson testified that he feared that potential buyers would somehow be scared away by the alleged confusion that would occur if Ms. Richardson were seen on the property without permission, the Court cannot give this fear any credence. In this regard, the Court notes a number of things. First, although Mr. Lewis testified that he was aware that Ms. Richardson had set foot on the property with potential investors during the case, he took no action, either as a result of her alleged trespass, or to determine and to contact the potential investors. Mr. Lewis is the person who was charged with maximizing the value for the creditors during this case, and therefore the party most sensitive to and most responsible for activities that might impair that value. Yet Mr. Lewis did not pursue any attempt to determine if any investor turned away because the investor was confused. The court can only conclude that Mr. Lewis saw no harm from Ms. Richardson's activities in this regard. If in fact he thought her presence on the

4

property presented the kind of danger that Mr. Sorenson claimed, certainly he would have done something, and the fact that he did nothing speaks volumes. Second, the Court cannot accept that if Ms. Richardson were to walk on the property with a potential investor, it would give rise to any confusion in any event. Not only are potential investors and buyers very sophisticated parties given the values of the property involved, the Court does not see why her setting foot on the property would create any greater confusion than her standing on the public sidewalk or driving through on the public streets with the very same investors. Moreover, as Mr. Sorenson admitted, other potential buyers not associated with Ms. Richardson (and the Court, notes, undoubtedly other people) might well walk the property without SRKO's permission, yet Mr. Sorenson was unconcerned about any potential confusion that would somehow impair SRKO's marketing efforts.

23. Mr. Sorenson's testimony that buyers *during* the chapter 11 case expressed concern that Ms. Richardson might regain control of the property or expressed some confusion about who had what rights to exercise is not evidence pertinent to the situation post-confirmation. The chapter 11 process gave Ms. Richardson a right to compete for the property which any buyer with the wherewithal to invest in Colorado Crossing would understand. Who has standing to do what in a chapter 11 case is confusing on its own – confusion is a product of the process, and is unlikely to be the result of anything Ms. Richardson did. But as noted, in all events, Ms. Richardson's activities in the chapter 11 environment where by law she had rights is not clear evidence that she will continue such conduct once the confirmation order cuts those rights off or that any prospective buyer will be confused.

24. Much of the other evidence presented about occurrences during the Chapter 11 case bear no relevance to the conduct now sought to be prohibited by the Plan injunction. The events of early 2011 regarding control of SRKO are so far in the past and in such a different context as to be no evidence. Whatever her activities regarding the Metro Districts, not only is there no connection between these activities in the conduct sought to be prohibited, but Ms. Richardson has not taken any action relating to the Metro Districts since she resigned from the board 18 months ago.

25. The fact that Ms. Richardson might currently be attempting to put together an offer to purchase the property is also not grounds for any sort of an injunction. Such activity is not only perfectly legal, but of potential advantage to the creditors. Again, there was a complete lack of any evidence that Ms. Richardson was making any misrepresentation of any kind to such potential investors concerning the project, much less that she was in control of SRKO, or that any investor with the level of sophistication required for a purchase offer of that magnitude would be misled.

26. Ultimately, even Mr. Sorenson admitted that the activities sought to be enjoined may or may not cause any harm. This falls far short of clearly establishing the necessity for injunctive relief required by the law. *United States ex rel. Citizen Band Potawatomi Indian Tribe of Okla. v. Enter. Mgmt. Consultants, Inc.*, 883 F.2d 886.

27. As to whether there would be an adequate remedy at law if Ms. Richardson engaged in the activities sought to be prohibited, the Court notes that there are other remedies.

5

For example, willful trespass might be considered criminal. State law provides legal causes of action for intentional interference with contract and interference with prospective business advantage.

28. The Court finds the balance of relative harm to weigh against the proposed injunction. Whereas the Court recognizes that the burden on Ms. Richardson would appear to be slight, it also recognizes that the alleged potential harm to SRKO is equally slight, if in fact there is any potential harm. What tips the balance against the Committee is the fact that the injunction is permanent and will therefore forever taint Ms. Richardson with the inference that she done something wrong and is likely to repeat it. Given the paucity of evidence that she is likely to do either of the acts prohibited by the proposed injunction after the confirmation order enters, leaving the public with this impression about Ms. Richardson would be a grievous thing.

29. As to the fourth factor, whether the public would be disserved by the entry of the injunction, the Court finds the factor does not apply in this case on either side.

30. The parties have both admitted the inability to find any bankruptcy case that addresses an injunction of the kind sought here. That alone gives this Court pause. The Court also finds instructive the approach to a permanent injunction request set forth in the *Waterton Polymer* case. In that case, even though the plaintiff was found to have made a sale of an infringing product and had taken significant steps to enter the American market, the court refused a permanent injunction because there was "little evidence to suggest Plaintiffs have taken any additional steps since" the lawsuit was filed. The case for a permanent injunction before this Court is even weaker: Ms. Richardson is not shown to have committed any of the acts sought to be enjoined, or to even have threatened to do so, once the confirmation order has entered.

31. Based on the foregoing, the Court will require that the injunction language be excised from the Plan as a condition of confirmation.

32. In addition, the Court finds Article VI, Section P, paragraph 13, which attempts to give the Court jurisdiction to hear "any claims or causes of action asserted by the Plan Proponents or REORGANIZED SRKO against any Richardson Party arising after the Effective Date involving Colorado Crossing" to be improper. The Supreme Court has made it clear that this Court's authority to hear matters is circumscribed. *Stern v. Marshall*, 131 S.Ct. 2594 (2011). This is particularly true post-confirmation, since the property of the estate has vested in the reorganized debtor under the Plan. The provision addresses claims "arising after the Effective Date." But such claims of SRKO are no longer arising in or under the Bankruptcy Code. Instead, the vast majority would be "related to" at best. Thus, the provision is overbroad. Moreover, whether this Court has jurisdiction is governed by 28 U.S.C. § 1334. Though this might argue in favor of leaving the objectionable language in the Plan since the statute ought to govern, the Court is also mindful that a party might attempt to claim that the Plan constitutes some form of consent to jurisdiction. There is no need to leave open the possibility of such disputes in the future. The issue of jurisdiction is best left to the statute, not the Plan. Accordingly, the Court will require that the offending provision be excised from the Plan.

6

DATED _____

                                                  BY THE COURT

                                                  _____
                                                  United States Bankruptcy Court Judge